

**ORDERED in the Southern District of Florida on September 09, 2011.**

_____
**A. Jay Cristol, Judge
United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| In re | Case No. 02-11913-BKC-AJC |
| | Chapter 11 |
| PSN USA, Inc. | |
| Debtor. | |
| PSN LIQUIDATING TRUST, | Adv. No. 08-01710-BKC-AJC-A |
| Plaintiff, | |
| v. | |
| INTELSAT CORPORATION, formerly known as PANAMSAT CORPORATION, and INTELSAT INTERNATIONAL SYSTEMS, LLC, formerly known as PANAMSAT INTERNATIONAL SYSTEMS, INC., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER (I) DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND (II) GRANTING
DEFENDANTS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THIS MATTER** came before the Court for hearing on July 28, 2011 at 3:00 p.m. upon *PSN Liquidating Trust's Motion for Partial Summary Judgment* [ECF No. 90][1] (the "Motion") and *Intelsat's Motion for Partial Summary Judgment* [ECF No. 95] (the "Cross-Motion"). The Court, having reviewed the record in this adversary proceeding and in the Debtor's main case, the Motion, the Cross-Motion, the various papers filed by the parties and affidavits of experts and third parties in support of and in opposition to the Motion and the Cross-Motion, and having heard the arguments of counsel, DENIES the Motion and GRANTS the Cross-Motion for the reasons set forth herein.

I.   **FACTUAL BACKGROUND**

The relevant facts are not in dispute and are derived principally from the parties' Joint Pretrial Stipulation [ECF 89], which includes a statement of uncontested facts; the Complaint filed by the Trust [ECF 1]; and this Court's prior Findings of Fact and Conclusions of Law dated October 31, 2005 [Main Case No. 02-11913, Docket No. 753] in connection with certain litigation between PSN USA, Inc. ("PSN" or the "Debtor") and a creditor of the Debtor.

The Debtor was a corporation organized under the laws of the State of Delaware and was a wholly-owned subsidiary of Pan American Sports Network International ("PSNI"). The corporate offices and principal place of business of the Debtor were located in Miami Beach, Florida and New York, New York. The Debtor operated the "PSN Channel," a 24-hour per day Spanish and Portuguese language cable television channel that broadcast live and taped sporting events. The customers of the PSN channel were cable television system operators in Latin America who made the programming of the PSN Channel available to their subscribers.

PSNI was a corporation organized under the laws of the Cayman Islands. PSNI had no employees and its sole place of business was at the offices of its registered agent in the Cayman

---

[1] Unless otherwise stated, ECF references are to docket numbers of pleadings filed in the adversary proceeding.

1

Islands. PSNI was a non-operating entity which acquired broadcast rights to the sporting events that were broadcast on the PSN Channel. There is no evidence that PSNI was ever authorized to do any business in any U.S. jurisdiction, and the Trust does not contend otherwise. Because PSNI was a non-operating entity, the Debtor supplied all of the administrative, financial, corporate, marketing and technical support services used in the production of the PSN Channel.

The sporting events for which PSNI acquired rights to broadcast were transmitted to the Debtor's production facilities in Florida, where they were bundled together with advertisements, infomercial, commentary and newscasts to produce the PSN Channel. The PSN Channel was then transmitted by the Debtor's employees via satellite to cable and satellite operators who, in turn, offered and distributed the PSN Channel as part of cable packages offered to end subscribers throughout Mexico, Central America, South America and the Caribbean. The Debtor's employees performed the operations necessary to physically broadcast the PSN Channel, including the satellite transmission of the PSN Channel, out of Florida. The production facilities, satellite equipment, uplink equipment, and studios that were used to produce the programming for the PSN Channel and/or broadcast the PSN Channel were located in Florida. There were no broadcast operations or equipment for the PSN Channel located in the Cayman Islands.

PanAmSat Corporation and PanAmSat International Systems, Inc., now known as Intelsat Corporation and Intelsat International Systems, LLC (collectively, "Intelsat"), the defendants in this adversary proceeding, provided the satellite services that enabled the PSN Channel to be uplinked to satellites for broadcasting under certain satellite contracts between Intelsat and PSNI (collectively, the "Satellite Contracts").[2] The services provided under the

---

[2] Although the payments at issue here arise from the Satellite Contracts between Intelsat and PSNI, the Debtor had also previously entered into a contract with Intelsat—the Broadcast Services Agreement dated September 29, 1999

Satellite Contracts were necessary for the PSN Channel to be produced and broadcast. The Trust does not dispute that the rates charged under the Satellite Contracts were market or below market rates for satellite services and transponder capacity that were charged in the industry at that time. Between August 7, 2000 and January 8, 2002, the Debtor made the payments to Intelsat that were due under the Satellite Contracts.

On March 1, 2002, the Debtor commenced its chapter 11 bankruptcy case. The PSN Liquidating Trust (the "Trust") was created pursuant to the Debtor's First Amended Plan of Liquidation (the "Plan"), which was confirmed by an order (the "Confirmation Order") of the Court dated December 24, 2002. Pursuant to the Confirmation Order and the Plan, all of the Debtor's claims against third parties, including claims to avoid preferential and fraudulent transfers under sections 547 and 548 of the Bankruptcy Code were transferred to the Trust.

On October 17, 2008, the Trust filed the Complaint commencing this adversary proceeding.[3] By stipulation, the parties have agreed that transfers in the total amount of $3,080,441 (the "Transfers")[4] were made by the Debtor to Intelsat under the Satellite Contracts. Counts I, III, IV, and VI of the Complaint (the "Constructive Fraud Claims") seek avoidance of the Transfers as constructive fraudulent transfers under either section 548(a)(1)(B) of the Bankruptcy Code or the corresponding Florida state statutes. Counts II and V of the Complaint (the "Actual Fraud Claims") seek avoidance of the Transfers as actual fraudulent transfers under

---

(the "BSA"). The Trust has stated it will not seek to avoid and recover as fraudulent transfers the transfers made by the Debtor to Intelsat under the BSA.

[3] The trustee of the Trust had commenced a prior adversary proceeding against Intelsat in 2004, seeking to avoid approximately $307,000 as alleged preferential transfers made by the Debtor to Intelsat in the 90-day preference period. On May 24, 2005, the parties agreed to dismiss that adversary proceeding and entered into a tolling agreement. More than three years later, the Trust filed the Complaint at issue, seeking to avoid and recover approximately $5 million in additional transfers as fraudulent transfers that had not been alleged in the 2004 complaint.

[4] The Trust contends that additional transfers in the amount of $1,056,071 were also made to Intelsat and are avoidable. Intelsat submits that the evidence is insufficient to establish that such transfers were actually made, or were made under the Satellite Contracts. However, the Court need not reach this issue because any such additional transfers would be unavoidable in any event, as discussed herein.

either section 548(a)(1)(A) of the Bankruptcy Code or the corresponding Florida state statutes. Count VII of the Complaint seeks alternative relief of avoidance of the Transfers that were made in the 90-day preference period as potential preferences under section 547 of the Bankruptcy Code, but it is not the subject of the Motion or the Cross-Motion.

The Trust now moves for partial summary judgment on the Constructive Fraud Claims. Intelsat opposes the Trust's motion for partial summary judgment and seeks summary judgment on the Constructive Fraud Claims as well as the Actual Fraud Claims.

## II.    SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, as incorporated by Federal Rule of Bankruptcy Procedure 7056, a court shall grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of proving that there is no dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   DISCUSSION AND ANALYSIS

To prevail on a claim for constructive fraudulent transfers under either the Bankruptcy Code or Florida state law, the Trust has the burden to prove all of the elements of a constructive fraud claim, including that the Debtor did not receive reasonably equivalent value in exchange for the Transfers. *See In re XYZ Options*, 154 F.3d 1262, 1275 (11th Cir. 1998); *In re World Vision Entertainment*, 275 B.R. 641, 655 (Bankr. M.D. Fla. 2002). Whether the Debtor received reasonably equivalent value in exchange for the Transfers is the central issue in this dispute.

Intelsat argues that, although that the Satellite Contracts were with PSNI, the Debtor received reasonably equivalent value because Intelsat provided to the Debtor, and the Debtor received and used, the satellite services and transponder capacity under the Satellite Contracts, and these services and transponder capacity were reasonably equivalent in value to the Transfers. In addition, Intelsat argues that, under the identity of interests rule, even if the Court were to conclude that PSNI received the benefit of the satellite services, the Debtor received indirect benefits constituting reasonably equivalent value because any benefit received by PSNI also benefitted the Debtor, in light of the nature of the Debtor's and PSNI's deeply intertwined relationship and shared identity of interests.

The Trust does not dispute that the Debtor operated as the production arm of the PSN Channel, and that PSNI was a non-operating company not authorized to conduct business in any jurisdiction in the United States. However, the Trust argues that the Debtor could not have received reasonably equivalent value in exchange for the Transfers because only PSNI "owned" the satellite services under the Satellite Contracts, and therefore only PSNI could receive the benefits thereunder. The Trust further asserts that Intelsat must pierce the corporate veil between the Debtor and PSNI to avail itself of the identity of interests rule.

### A. The Debtor Received Reasonably Equivalent Value Because It Received and Used the Satellite Services

Where a debtor received or made use of the goods and services for which a third party debt was incurred, the debtor received reasonably equivalent value in exchange for transfers made by the debtor on account of the debt. *See In re Evans Potato Co.*, 44 B.R. 191, 193-94 (Bankr. S.D. Ohio 1984) (recognizing general rule that "payment of or assumption of a third party's debt by an insolvent is a transfer without fair consideration and is thus fraudulent," but holding that debtor received reasonably equivalent value for payment of third party debt

because debtor had use of the goods sold by transferee); *see also In re Rodriguez*, 895 F.2d 725, 728 n.5 (11th Cir. 1990) ("The court [in *Evans Potato*] found that the debtor had received reasonably equivalent value for its payments because it made use of the goods."); *In re Chicago, Missouri & W. Ry. Co.*, 124 B.R. 769, 773 (Bankr. N.D. Ill. 1991) (noting that, in *Evans Potato*, "the court held that the debtor corporation received reasonably equivalent value for payment of an individual's debt because the debtor received the goods for which the debt was incurred").

The undisputed facts in the record clearly support the conclusion that the Debtor received and used the satellite services and transponder capacity provided by Intelsat under the Satellite Contracts. The Debtor operated the PSN Channel, the satellite services provided by Intelsat were necessary and critical to the broadcast of the PSN Channel, and the Debtor's employees performed all of the functions necessary to transmit programming on the PSN Channel to Intelsat's satellites. On the other hand, PSNI was a non-operating company, with no employees and was not authorized to conduct any business in the United States, where all of the operations of the PSN Channel took place. The Debtor thus received and used Intelsat's satellite services; PSNI could not and did not.[5] Absent the services provided by Intelsat, the Debtor would not have been able to distribute its programming to the cable television system operators that were its customers. Furthermore, the Trust does not dispute that the value of the satellite services were reasonably equivalent to the Transfers.[6] Accordingly, notwithstanding that the

---

[5] The Trust also argues that *In re Evans Potato* is inapposite because the debtor in that case had *exclusive* use of the goods, and the Debtor here, to the extent it received the satellite services, did not have exclusive use of them. The Trust's argument is neither factually nor legally persuasive. The facts simply do not provide any basis to conclude that any party other than the Debtor used the satellite services. Moreover, the Eleventh Circuit does not interpret *In re Evans Potato* to include a requirement that the debtor have exclusive use of the goods or services. *See In re Rodriguez*, 895 F.2d at 728 n.5.

[6] The Debtor's CFO, Mr. Robert Cardenas, stated in his deposition that he did not believe that the amounts that Intelsat charged for satellite services under the Satellite Contracts were unfair or inconsistent with market rates. Moreover, Mr. Richard Kohlweg, a Regional Manager at PanAmSat Corporation who was involved in the negotiations over the Satellite Contracts, submitted a declaration stating that the rates PanAmSat charged for the satellite services under the Satellite Contracts were actually below the applicable rates provided for in PanAmSat's rate cards that were used to determine rates PanAmSat charged similarly situated customers at the time.

Debtor paid the obligations of PSNI under the Satellite Contracts, the Debtor's receipt and use of the satellite services and transponder capacity constitutes reasonably equivalent value.

The Trust advances the novel theory that the Debtor could not have received the satellite services because PSNI was the only party who "owned" the satellite services under the Satellite Contracts. The Trust, citing to the Florida fraudulent transfer law, asserts that the Debtor could only have received value in exchange for the Transfers if it received "property," which is defined as "anything that may be the subject of ownership." FLA. STAT. § 706.102(10). This position has no support in the caselaw of the courts in this and other Circuits. As a preliminary matter, because the Florida constructive fraudulent transfer statutes are "analogous in form and substance" to the Bankruptcy Code constructive fraudulent transfer statute, "[t]he test common to the Bankruptcy Code and each of the Florida statutes is whether the debtor received reasonably equivalent value in exchange for the obligation or transfers." *In re Tower Envtl., Inc.*, 260 B.R. 213, 222 (Bankr. S.D. Fla. 1998); *see also In re TOUSA, Inc.*, 444 B.R. 613, 638 n.32 (S.D. Fla. 2011) (noting that bankruptcy court held there were "'no material differences' between the legal standards under the Bankruptcy Code and Florida … law").[7]

The Trust does not cite, and the Court has failed to locate, any case that holds that the standard to determine reasonably equivalent value for the purposes of constructive fraudulent transfers under state or federal law is whether the debtor received something that may be the subject of ownership. To the contrary, courts have expressly taken an expansive view of what constitutes reasonably equivalent value. For example, the District Court in *TOUSA, Inc.* found:

> [T]he weight of authority supports the view that indirect, intangible, economic benefits, including the opportunity to avoid default, to facilitate the enterprise's rehabilitation, and to avoid bankruptcy, even if it provided to be short lived, may be considered in determining reasonably equivalent

---

[7] The Trust also agrees that the Florida constructive fraudulent statutes are substantively equivalent to section 548 of the Bankruptcy Code.

7

> value. An expectation, such as in this case, that a settlement which would avoid default and produce a strong synergy for the enterprise, would suffice to confer 'value' so long as that expectation was legitimate and reasonable.

444 B.R. at 660. *See also In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325 (11th Cir. 2002) (administrative and office services performed by transferee could constitute value); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991) (ability to borrow money, strong synergies produced by merger of firms, and goodwill as having value for the purposes of determining reasonably equivalent value in fraudulent transfer actions); *In re Tower Environmental, Inc.* (resolution of criminal charges in exchange for entering into the plea bargain conferred reasonably equivalent value on the debtor); *In re Richards & Conover Steel, Co.*, 267 B.R. 602, 613 (B.A.P. 8th Cir. 2001) (legal services found to be reasonably equivalent value); *In re McDonald*, 265 B.R. 632, 637 (Bankr. M.D. Fla. 2001) (defendant transferee provided value to the debtor by forbearing on foreclosing on related third party's lots, thus preserving the debtor's opportunity to purchase the third party's mobile homes); *In re Pembroke Dev. Corp.*, 124 B.R. 398 (Bankr. S.D. Fla. 1991) (creditor's forbearance on foreclosure of loan conferred reasonably equivalent value). The Court agrees that, consistent with the well-settled caselaw, value is not restricted to the exchange of "property" or "anything that may be the subject of ownership." Indeed, the District Court in *TOUSA* specifically rejected the creditor committee's position, which was similar to what the Trust argues here, that property should be limited to the dictionary definition of an enforceable entitlement to some tangible or intangible article. *In re TOUSA, Inc.*, 444 B.R. at 660.

      Lastly, to the extent that the Trust argues that the satellite services provided by Intelsat had the economic effect of benefiting only PSNI (even if the Debtor used the services), the Eleventh Circuit has held that "a determination of whether value was given under Section

548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d at 1332.  Thus, in this case, even if the economic *impact* of the satellite services benefitted PSNI, the focus of the inquiry should be on the *value* of the satellite services provided to the Debtor, and the Trust does not dispute that the value of the satellite services was reasonably equivalent to the Transfers.  Accordingly, the Debtor received reasonably equivalent value in exchange for the Transfers and the Transfers are not avoidable as constructive fraudulent transfers.

### B. The Debtor Received Reasonably Equivalent Value Because the Debtor And PSNI Shared An Identity Of Interests

Even if the Court were to accept the Trust's argument that only PSNI could have received the benefits of the satellite services under the Satellite Contracts, the Debtor also received indirect benefits that constitute reasonably equivalent value because the Debtor and PSNI shared an identity of interests such that any benefits of the satellite services received by PSNI also benefitted the Debtor.  The District Court in *TOUSA* held that indirect benefits may be conferred upon a debtor if the debtor and the third party share an identity of interest, such that a benefit to the third party also benefits the debtor:

> The identity of interests rule recognizes that if the debtor and the third party are so related or situated that they share an identity of interests, then what benefits one will, in such case, benefit the other to some degree. … An analysis of whether a parent and subsidiary share an identity of interest is frequently undertaken in cases involving upstream guarantees or financing, which occur when a subsidiary corporation loans its parent money or guarantees its parent's obligations.  The identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit even though each member of the enterprise is a separate entity.

9

*In re TOUSA, Inc.*, 444 B.R. at 654 n.43.  This Court has also recognized the identity of interests rule.  *See In re Miami Gen. Hosp., Inc.*, 124 B.R. 383, 393-95 (Bankr. S.D. Fla. 1991); *In re Pembroke Dev. Corp.*, 124 B.R. 398, 399-401 (Bankr. S.D. Fla. 1991); *see also Armstrong v. Collins*, 2010 WL 1141158, at 28 (S.D.N.Y. Mar. 24, 2010); *Telefast, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368,1378 (D.N.J. 1984); *In re Royal Crown Bottlers of N. Ala., Inc.*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982).[8]

In this case, the record demonstrates that the Debtor and PSNI shared an identity of interest such that any benefit PSNI received from the satellite services also benefitted the Debtor.  In his deposition, the Debtor's CFO at the time of the Transfers stated that, with respect to the relationship between Debtor and PSNI, the Debtor was the production arm and PSNI was the broadcast rights holder for the PSN enterprise:  "[M]anagement looked at the company as one.  PSN International, PSN USA.  One couldn't operate without the other.  So it's basically collectively they made up PSN, the Network."  Moreover, the Debtor did business under the name "PSN International," and both the Debtor and PSNI did business under the trade name "Pan American Sports Network."  The Debtor and PSNI also shared the same officers.  And the Debtor and PSNI utilized an integrated cash management system.  *See* Reply Declaration of Melissa Davis (the Trust's expert witness) [ECF 104] ¶ 4-5.

Based on all of the facts in the record, the Court concludes that the relationship between the Debtor and PSNI was that of a single enterprise, sharing an identity of interest that centered around the PSN Channel.  Accordingly, even if the Court were to conclude that PSNI received the benefit of the satellite services, the Debtor indirectly benefitted as well.  These

---

[8] The Trust argues that Intelsat must pierce the corporate veil in order to avail itself of the protections of the identity of interest rule.  This argument, however, is not supported by the caselaw, including the cases cited herein, none of which require a transferee to pierce the corporate veil.  Indeed, this Court has expressly held that piercing the corporate veil is not required to establish the validity of a creditor's receipt of a loan repayment from a debtor where the borrower was an affiliate of the debtor, but that the focus should be on an analysis of the economic realities and identity of interests of the affiliated entities.  *See In re Miami Gen. Hosp., Inc.*, 124 B.R. at 387.

indirect benefits to the Debtor constitute reasonably equivalent value and shield the Transfers from avoidance.

### C. The Trust Fails To Assert Actual Fraud Claims

Intelsat's Cross-Motion also seeks summary judgment dismissing the Actual Fraud Claims. The Trust has not objected to dismissal of the Actual Fraud Claims. There are no facts alleged in the record that support the claim that the Debtor made the Transfers with the intent to hinder, delay or defraud creditors. Accordingly, Intelsat is entitled to summary judgment dismissing the Actual Fraud Claims.

### IV. CONCLUSION

This Court concludes that the Trust cannot satisfy its burden to show that the Debtor did not receive reasonably equivalent value in exchange for the Transfers. As set forth herein, the Debtor received reasonably equivalent value in exchange for the Transfers because the Debtor received and used the satellite services provided by Intelsat under the Satellite Contracts. Moreover, even if PSNI received the benefits of the satellite services, the Debtor shared an identity of interest with PSNI, such that the benefits to PSNI also benefitted the Debtor. Lastly, the Debtor has not alleged any facts to support the Actual Fraud Claims. Intelsat is therefore entitled to summary judgment in its favor on the Constructive Fraud Claims and to dismissal of the Actual Fraud Claims. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Intelsat's Cross-Motion is GRANTED with respect to the Constructive Fraud Claims, which are set forth in Counts I, III, IV and VI of the Complaint, and the Trust's Motion is DENIED.

2. Intelsat's motion for partial summary judgment is GRANTED with respect to the Trust's Actual Fraud Claims set forth in Counts II and V of the Complaint, and the Trust's motion for partial summary judgment is DENIED with respect to the Actual Fraud Claims.

3. A status conference is scheduled for October 17, 2011 at 10:00 a.m. at which time the parties shall advise the Court as to the issues, if any, that remain to be resolved in this proceeding.

# # #

Copies furnished to:

Edward Griffith, Esq.
Hanh Huynh, Esq.

HF 6653573v.4 #13930/0003